**MOBILEYE, INC. and Mobileye Technologies Ltd.,**
**Plaintiffs,**

v.

**PICITUP CORP., Picitup Israel, Ltd., Ionroad Ltd., and Ionroad Technologies Ltd., Defendants.**

**No. 12 Civ. 1994 (JSR).**

United States District Court,
S.D. New York.

March 5, 2013.

762

Louis M. Solomon, John T. Moehringer, Karen J. Axt, Robert M. Pollaro, Cadwalader, Wickersham & Taft LLP, New York, NY, for Plaintiffs.

David A. Loewenstein, Guy Yonay, Clyde A. Shuman, Pearl Cohen Zedek Latzer LLP, New York, NY, Sibley P. Reppert, Pearl Cohen Zedek Latzer LLP, Boston, MA, for Defendants.

## OPINION AND ORDER

JED S. RAKOFF, District Judge.

Plaintiffs Mobileye, Inc. and Mobileye Technologies Ltd. (collectively, "Mobileye") bring this action against defendants Picitup Corp., Picitup Israel, Ltd., iOnRoad Ltd., and iOnRoad Technologies Ltd. (collectively, "iOnRoad") asserting twelve federal and state-law causes of action. Mobileye is an Israeli-based manufacturer of single-camera-based Advanced Driver Assistance Systems ("ADAS"), which warn drivers when they are drifting out of their lane or are about to collide with an object in front of them. iOnRoad is the developer of a mobile application, or "app," for Android smartphones that purports to perform similar functions. In connection with iOnRoad's development, promotion, and sale of its app, Mobileye asserts claims for patent infringement, false advertising, trademark infringement, trademark dilution, misappropriation, deceptive acts and practices, and unjust enrichment.

On September 19, 2012, iOnRoad moved for summary judgment on all claims. On January 15, 2013, the Court issued a "bottom line" order granting the motion in part and denying it in part. Specifically, the Court granted summary judgment dismissing the claims for patent infringement, trademark dilution, and deceptive acts and practices. The Court further granted summary judgment dismissing the claims for false advertising to the extent that those claims rest on alleged implicit representations of government approval or on alleged omissions of material differences between Mobileye's and iOnRoad's respective products. The Court denied summary judgment on the claims for false advertising to the extent that they rest on other allegedly false or misleading representations, and also denied summary judgment on the claims for trademark infringement, misappropriation, and unjust enrichment. This Opinion and Order sets forth the reasons for those rulings and confirms them with one minor exception related to one aspect of Mobileye's false advertising claims, an aspect that the Court now concludes escapes summary judgment and as to which the Order of January 15, 2013, is hereby amended.

In ruling on a motion for summary judgment, this Court "view[s] the evidence in the record in the light most favorable to the nonmoving party"—here, Mobileye—"drawing all reasonable inferences in that party's favor." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). In light of the varied factual allegations pertaining to each of Mobileye's claims, however, the Court discusses the facts relevant to each claim separately in turn.

### 1. Patent Infringement Claims

#### a. The Facts [1]

This case concerns three patents owned by Mobileye: U.S. Patent No. 7,113,867 (the " '867 Patent"), U.S. Patent No. 8,082,101 (the " '101 Patent"), and U.S. Patent No. 6,704,621 (the " '621 Patent"). Mobileye alleges that iOnRoad's app infringes claims 1–5 and 7 of the '867 Patent, claims 1–5, 8–12, 14, 20–21, and 23–24 of

---

**1.** Throughout this Opinion, "the facts" refers to facts that are either undisputed or, where disputed, are taken most favorably to plaintiffs.

the '101 Patent, and claims 1, 13, and 35 of the '621 Patent.

Mobileye contends that these claims are infringed by two functions of iOnRoad's app, forward collision warning ("FCW") and lane departure warning ("LDW"). The FCW function purports to warn a driver when he or she is about to collide with an obstacle ahead, usually another car. The FCW function begins its calculations by identifying an obstacle in the road ahead and calculating the distance between that obstacle and the host vehicle. The app performs this calculation by analyzing certain features of images captured by the phone's camera, using three techniques. In the "lanes technique," the app measures the horizontal width of the lane at the rear of the lead car in the image, and then calculates the distance to the lead car based on the assumption that a standard lane is 3.2 meters wide. Def.'s Rule 56.1 Statement in Supp. of their Mots. for Summ. J. of Non–Infringement and Invalidity ("Def.'s Patent 56.1") ¶¶ 23–24.[2] In the "shadow technique," the app measures the width of the lead car's undershadow in the image, and then calculates the distance to the lead car on the assumption that a standard car is 1.5 meters wide. *Id.* ¶ 25–26.[3] Finally in the "taillights technique," the app measures the distance between the taillights of the car in the image, and then calculates the distance to the lead car based on the assumption that standard car taillights are 1.5 meters apart. *Id.* ¶ 30.[4]

The app repeats these distance calculations at regular intervals and stores the ten most recent calculated distances, excluding outliers, in an array. *Id.* ¶ 36.[5] The app then uses those distances to calculate the time it would take for the host and lead vehicles to collide—the "time-to-collision" or "TTC"—based on the simple equation TTC = (current distance between the host vehicle and the obstacle)/(relative velocity between the host vehicle and the obstacle). *Id.* ¶ 30–31, 34.[6] The app calculates the relative velocity between the host vehicle and the obstacle based on the last ten distance calculations, the differences between each successive distance calculation, the average difference in distance, and the number of frames per

2. Rule 56.1 statements cited by the Court are undisputed as to the proposition for which they are cited unless otherwise noted. In this instance, Mobileye objects to statements 23 and 24, as well as many other 56.1 statements, on the ground that they are unsupported by admissible evidence because iOnRoad cites for support only to incomplete depositions answers, rather than to complete questions and answers. Pls.' Resp. to Def.'s Patent 56.1 ¶¶ 23–24. Having reviewed the full questions and answers, the Court hereby overrules this objection, both in this instance and in every other instance in which it is raised with respect to a Rule 56.1 statement cited herein.

3. Mobileye disputes statement 25 on the ground that it mischaracterizes the cited testimony, and statement 26 on the ground that it is vague. Pls.' Resp. to Def.'s Patent 56.1 ¶ 25. Upon review of the underlying supporting evidence, the Court overrules these objections.

4. Mobileye disputes this statement on the ground that it is vague. Pls.' Resp. to Def.'s Patent 56.1 ¶ 30. Upon review of the underlying supporting evidence, the Court overrules this objection.

5. Mobileye disputes this statement on the grounds that it is unsupported by the cited supporting evidence, and is vague, misleading, and incomplete. Pls.' Resp. to Def.'s Patent 56.1 ¶ 36. Upon review of the underlying supporting evidence, the Court overrules these objections.

6. Mobileye disputes these statements on the grounds that they are vague, misleading, and unsupported by some of the cited supporting evidence. Pls.' Resp. to Def.'s Patent 56.1 ¶¶ 30–31, 34. Upon review of the underlying supporting evidence, the Court overrules these objections.

second taken by the phone's camera. *Id.* ¶¶ 40–43.[7]

The second relevant function of iOnRoad's app, the LDW function, purports to warn a driver when he or she is drifting over a solid lane marking. The LDW function works by finding the lane markings in the image, and then comparing the angle of the left lane marking with the angle of the right lane marking. *Id.* ¶¶ 49–50.[8] The app makes use of the fact that when a driver is within his or her lane, these two angles are similar, but when the driver is out of the lane, the two angles are different. The app thus calculates the difference between the two angles, and if that difference exceeds a certain threshold, a warning is triggered. *Id.* ¶ 54.[9]

### b. Threshold Issues

■ Before turning to the merits of Mobileye's infringement claims, the Court addresses two threshold issues. First, on October 26, 2012, Mobileye filed with its opposition papers a new expert report in the form of a declaration from Dr. Gerard G. Medioni. The deadline for submission of expert reports in this case was July 23, 2012. Mobileye previously attempted to submit a supplemental expert report from Dr. Medioni after that date, which the Court ordered stricken on September 10, 2012. iOnRoad argues that the newly submitted expert declaration reintroduces portions of the already excluded supplemental report, adds new opinions on which iOnRoad was not able to depose Dr. Medioni, and contradicts Dr. Medioni's prior expert reports and deposition testimony, and thus must be stricken.

■ The Court agrees. Because the late submission of the Medioni declaration was neither "substantially justified [n]or harmless," Fed.R.Civ.P. 37(c)(1), the Court hereby orders the declaration stricken. As the Federal Circuit has observed, "attempts to proffer expert testimony without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court. Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences of such manipulation of the litigation process." *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1366 (Fed.Cir.2011) (internal quotation marks omitted).

The second threshold issue concerns the fact that the Court has not yet had occasion to construe the asserted patent claims in this case. In a hearing on May 7, 2012, the Court permitted the parties to request a *Markman* hearing if they so wished, but neither side did so. Nevertheless, the summary judgment briefing is replete with claim construction disputes. iOnRoad asks the Court to resolve those disputes on summary judgment, or, if necessary, to hold a separate *Markman* hearing at this stage. Mobileye suggests instead that the Court should simply reject any of iOnRoad's arguments premised on disputed claim constructions.

---

7. Mobileye disputes these statements on the grounds that they are not supported by the cited supporting evidence, and are incomplete and misleading. Pls.' Resp. to Def.'s Patent 56.1 ¶¶ 40–43. Upon review of the underlying supporting evidence, the Court overrules these objections.

8. Mobileye disputes these statements on the grounds that they are incomplete, misleading, and unsupported by the cited supporting evidence. Pls.' Resp. to Def.'s Patent 56.1 ¶¶ 49–50. Upon review of the underlying supporting evidence, the Court overrules these objection.

9. Mobileye disputes this statement on the ground that it is vague. Pls.' Resp. to Def.'s Patent 56.1 ¶ 54. Upon review of the underlying supporting evidence, the Court overrules this objection.

While it is the parties who have brought these problems on themselves, in the end, these arguments are mostly moot, because, as will become clear, the Court is able to resolve iOnRoad's motion without reaching the parties' principal claim construction disputes. As to the other, more minor claim constructions decided in this Opinion, the Court finds that they involve no genuine dispute of material fact, and thus are amenable to summary judgment. *See Ballard Med. Products v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed.Cir.2001) ("*Markman* [*v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir. 1995)] does not require a district court to follow any particular procedure in conducting claim construction."); *Safe–Strap Co., Inc. v. Koala Corp.*, 270 F.Supp.2d 407, 415 (S.D.N.Y.2003) ("[C]laim construction is amenable to summary judgment."). A *Markman* hearing is thus unnecessary.

### c. The '867 Patent

The '867 Patent discloses a system for estimating the TTC of a vehicle with an obstacle, comprising an image receiver and a processor. '867 Patent (filed Nov. 26, 2000), abstract. Under claim 1 of the patent, the image receiver is configured to capture two or more images in succession. *Id.*, claim 1.A. The processor identifies two "features" of the obstacle from one image, and then determines a "dimension length associated with" those two features—in other words, the distance between the two features in the image. The processor then repeats this determination for the same two features in a second image. These two dimension lengths are then divided into one another to create a ratio, which the patent terms the "scaling factor," which is then used to calculate the TTC. *Id.*, claim 1.B. All of the remaining asserted claims are dependent on claim 1. Essentially, the claimed system makes use of the fact that as objects get closer, they appear larger, and thus the apparent distance between any two features of the object increases.

iOnRoad argues that its app does not infringe these claims because it does not use a scaling factor to calculate the TTC. According to Mobileye, however, the app uses a scaling factor because its calculations employ a ratio between, on the one hand, the current distance between the host vehicle and the obstacle, and, on the other hand, the average difference in distances between each of the last ten distances. For example, if the current distance is 20 meters, and the last ten distances were, from least recent to most recent, {29, 28, 27, ... 21, 20}, then the average difference in distances would be 1 meter, and the ratio would be 20:1.

iOnRoad responds, convincingly, that this ratio does not represent the claimed scaling factor for two reasons. First, the denominator of the claimed scaling factor is "the [dimension] length between ... two features of the obstacle" in a second image. '867 Patent, claim 1.B. But the denominator of the ratio used in the iOnRoad app is not a distance or a length at all. Rather, it is the average difference in distances over the last ten distance calculations. Thus, in the example above, 1 meter is not a distance or a length of anything.

Second, in the alternative, iOnRoad notes that the claimed scaling factor is "a ratio between a dimension length associated with two features of the obstacle" in one image and "the same length between the same two features of the obstacle" in a second image. *Id.* Even if the denominator of the accused ratio (the average difference in distances)· somehow constitutes a claimed dimension length, it is not the *same* length between the *same* two features of the obstacle as the numerator of the accused ratio (the current distance).

In other words, in the example above, even assuming that 20 meters and 1 meter are both claimed dimension lengths, they are not the same dimension length between the same two features, and therefore their ratio does not represent a claimed scaling factor.

Mobileye's response to these strong arguments is unconvincing. Mobileye contends that its expert, Dr. Medioni, opined that both the numerator and the denominator of the accused ratio "are based on [the] 'same length between the same two features of the obstacle' as required by the claims." Pls.' Counterstatement of Material Undisputed Facts Opposing Defs.' Mot. for Summ. J. of Patent Non–Infringement and Invalidity ("Pls.' Patent 56.1") ¶ 55. But the only supporting authority Mobileye cites for this opinion is Dr. Medioni's untimely and now-stricken declaration. Mobileye further contends that iOnRoad's infringement expert, Dr. David J. Heeger, "agreed" in his deposition testimony "that the scaling factor used in the [iOnRoad] code is the same as that described in the '867 patent." Id. ¶ 57. However, Mobileye's only citation for this proposition is to the entire transcript of Dr. Heeger's deposition, without any reference to a particular page or pages. See id.

These two pieces of evidence cited by Mobileye are insufficient to raise a genuine dispute of material fact, for several reasons. First, these two pieces of evidence are responsive to iOnRoad's second argument, but not its first. Second, since Dr. Medioni's declaration has been stricken from the record, it cannot defeat summary judgment. Third, even if the declaration were admitted, it side-steps the central issue by stating, in conclusory fashion, that the numerator and denominator of the accused ratio are merely "based on" the same dimension lengths. That opinion is not inconsistent with iOnRoad's careful argument that the numerator and denominator of the accused ratio are not the "same" dimension lengths in successive images, as claimed in the patent.

Finally, as for Dr. Heeger's deposition testimony, Mobileye cannot support its bald contention that he "agreed" that iOnRoad's app employs a claimed scaling factor by citing nonspecifically to an entire 325–page deposition transcript. And, in any event, a review of the transcript shows that Dr. Heeger in fact expressed clear disagreement with Mobileye's conclusion and carefully explained how the accused ratio differs from the claimed scaling factor. See Decl. of Robert M. Pollaro, Ex. TT, at 148–50.

The Court thus finds that Mobileye's only arguments on this issue are unfounded, and further concludes that iOnRoad's app does not infringe the asserted claims of the '867 patent because it does not employ a claimed scaling factor, for precisely the reasons iOnRoad argues.[10] Having resolved this claim in this manner, the Court need not address the parties' claim construction dispute, iOnRoad's alternative noninfringement argument, or iOnRoad's arguments that the '867 Patent is invalid.

---

**10.** Mobileye did not raise the doctrine of equivalents in its summary judgment papers or at oral argument, and Court therefore deems any argument based on that doctrine forfeited. Moreover, even if Mobileye had raised an equivalency argument, the Court would reject it. As iOnRoad points out, Mobileye repeatedly narrowed the claim language of the '867 Patent to avoid the prior art. Def.'s Patent 56.1 ¶¶ 84, 90–93. (The Court overrules Mobileye's objections to these 56.1 statements to the extent that they deny the fact of multiple narrowing amendments.) Those narrowing amendments give rise to a presumption that Mobileye has surrendered all relevant equivalents, which Mobileye has not attempted to rebut. See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 740, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002).

#### d. '101 Patent

 The '101 Patent discloses two main purported innovations: (1) a method for calculating TTC that accounts not only for the relative velocity between the host vehicle and the obstacle, but also for the relative acceleration, and (2) a method for determining whether an obstacle is on a collision course with the host vehicle by determining the motions of at least two features of the obstacle and then predicting whether those features will straddle the host vehicle at the TTC. '101 Patent (filed Jan. 19, 2005), abstract.

The asserted claims related to the first purported innovation of the '101 Patent are claim 1 and dependent claims 2–5, 8–12, and 14. Claim 1 discloses a method of determining TTC based on "a rate of change over times t of the momentary time $T_v(t)$," which the parties agree refers to the relative acceleration between the host vehicle and the obstacle. iOnRoad argues that its app does not infringe claim 1 and its dependent claims because the app's method of calculating TTC does not account for relative acceleration.

iOnRoad argues that Mobileye cannot point to any function or source code in the app that calculates or uses relative acceleration. In response, Mobileye notes that its expert opined, and iOnRoad's expert agreed, that while only two distance measurements are necessary to account for relative velocity, three or more such measurements are necessary to account for relative acceleration, and iOnRoad's app stores ten such measurements in an array. Pls.' Patent 56.1 ¶¶ 100–102. iOnRoad replies that this evidence merely shows that that the app *could* account for relative acceleration, not that it actually *does* so.

The Court again finds itself in full agreement with iOnRoad. Mobileye has at best shown only the possibility that the app might account for relative acceleration

in its TTC calculation as claimed in the patent, but it is well established that sheer conjecture or "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment in favor of a defendant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence Mobileye proffers is simply insufficient to persuade any reasonable juror that the app accounts for relative acceleration.

Moving to the second purported innovation of the '101 Patent, the asserted claims relating to that innovation are claim 20 and dependent claims 21 and 23–24. Claim 20 discloses a method of determining whether a vehicle and an object are on a collision course. The method comprises several steps, including determining "from the motions" of at least two features of the obstacle "whether at the TTC, the real-space horizontal coordinates of said at least two features straddle the real-space horizontal coordinate of the position in the vehicle." '101 Patent, claim 20(d). In plain English, the claimed method determines whether a vehicle and obstacle will collide by determining whether, at the time of collision, at least one feature of the obstacle will be located to the right of a point in the vehicle and at least one other feature will located to the left.

iOnRoad argues that its app does not infringe this claim and its dependent claims for two reasons: the app does determine the motions of any features of the obstacle, and also does not incorporate a straddling calculation. On both points, iOnRoad again alleges a simple failure of proof by Mobileye. iOnRoad explains that the accused portion of its source code simply disables the FCW alert if less than 25 percent of the obstacle is within a specified "area of interest" in the center of the image. Pls.' Patent 56.1 ¶¶ 104, 106.

Nothing about this exception in the FCW function involves determining the motions of features or predicting the location of features at the time of collision.

Mobileye offers a twofold response. First, Mobileye asserts that iOnRoad's argument rests on an improper claim construction, because the claim language contains no limitation requiring a "prediction." Second, Mobileye contends that the accused aspect of the FCW function serves to determine whether the vehicle and the obstacle are on a collision course, and that that determination inherently includes a determination of whether a point in the vehicle will be straddled by two features of the obstacle.

Upon review, the Court is persuaded by both of iOnRoad's arguments and neither of Mobileye's counterarguments. To begin with, neither of Mobileye's counterarguments is responsive to iOnRoad's argument that the app does not infringe because it does not determine the claimed "motions" of features of the obstacle. Indeed, Mobileye's own Rule 56.1 counterstatement indicates that the accused portion of the app's source code simply determines the obstacle's static current position in the image relative to the area of interest, and does not determine the "motions" of anything at all. *See* Pls.' Patent 56.1 ¶ 106 ("Dr. Medioni opined that if 25% or less of the obstacle width overlaps with the lane projection region, the collision warning is ignored.").

Moreover, while Mobileye's counterarguments are responsive to iOnRoad's second noninfringement argument, they are unconvincing. Mobileye's claim construction counterargument is particularly unpersuasive. The plain language of the claim requires a determination of whether two or more features of the obstacle straddle a position in the vehicle "at the TTC," which, if the patented invention is to be of any use to a driver, must be in the future.

A determination as to whether or not a particular fact will occur in the future is the very definition of a "prediction."

As to Mobileye's contention that the app's accused FCW exception inherently includes a straddling determination, that argument rests on a conflation of two distinct concepts that is inconsistent with the claim language. Mobileye argues in essence that any method for predicting whether a vehicle and an obstacle are on a collision course inherently includes a straddling determination. But if that were the case, then all of the limiting language in claim 20(d) referring to straddling would be mere surplusage. Mobileye cannot now claim that its patent covers all collision course prediction methods when the claim language clearly states that it covers only those methods that incorporate a straddling determination.

Accordingly, the Court concludes that the iOnRoad app does not infringe the asserted claims of the '101 Patent. As with the '867 Patent, the Court thus need not reach the parties' other claim construction disputes, iOnRoad's alternative noninfringement arguments, or iOnRoad's invalidity arguments.

### e. '621 Patent

■ The asserted claims of the final patent-in-suit, the '621 Patent, disclose a method, a system, and a computer program product that each estimate the "ego-motion" of a vehicle moving along a roadway in two steps: receiving at least two images, and processing the image information to generate an ego-motion estimate. '621 Patent (filed Nov. 26, 2000), abstract, claims 1, 13, 35. Mobileye alleges that these claims are infringed by the LDW function of the iOnRoad app, which, as explained above, determines whether the host vehicle is drifting out of its lane by comparing the angles of the left and right lane lines.

iOnRoad argues that the LDW function does not infringe the asserted claims for the simple reason that it only estimates the position of the car relative to the roadway, not its motion. In response, Mobileye proffers two pieces of purported evidence to the contrary. First, Mobileye again cites to the now-stricken Medioni declaration for the proposition that the LDW function does in fact estimate motion. And second, Mobileye contends that iOnRoad itself admits that the LDW function estimates motion, because the very purpose of the LDW function is to determine whether the vehicle is proceeding within its lane or is instead departing from the lane.

Again, Mobileye's responses to iOnRoad's noninfringement arguments are unavailing. The Medioni declaration has been stricken and therefore cannot raise a genuine dispute of material fact. In any event, Medioni's assertion that the app in fact estimates ego-motion is conclusory and unsupported by any citation or further explanation. *See* Medioni Decl. ¶ 51. And Mobileye's claim that iOnRoad has admitted that the LDW function estimates motion rests on yet another conflation, this time between what the LDW function actually determines and what a driver using the app is intended to infer from that determination.

The undisputed evidence before the Court shows that the LDW function determines the host vehicle's position, not motion, relative to the left and right lane lines. Indeed, based on the evidence before the Court, it appears that the LDW function would behave no differently whether the host vehicle were stationary or speeding down the roadway at 100 miles per hour. Regardless of the vehicle's motion, if the LDW function determines that the host vehicle's position is such that the difference between the angles of the two lane lines exceeds a threshold, the app alerts the driver, who is then intended to infer that the vehicle may be moving out of its lane, even if the vehicle in fact is not moving at all.

The Court thus concludes that the iOnRoad app does not infringe the asserted claims of the '621 Patent. As with the previous two patents-in-suit, this resolution obviates any need to reach the parties' claim construction disputes, alternate noninfringement arguments, or invalidity arguments.

### 2. False Advertising and Unfair Trade Practices Claims

#### a. The Facts

In addition to its claims for patent infringement, Mobileye also alleges that a variety of iOnRoad's promotional statements constitute false advertising under the Lanham Act and unfair trade practices under New York law.[11] These promotional statements appeared on iOnRoad's website, in the description of the iOnRoad app on the Google Play online app marketplace, and in various other media. Some of the statements, but not all, have been removed from iOnRoad's website. Pls.' Counterstatement of Facts Pursuant to L.R. 56.1 ("Pls.' Nonpatent 56.1") ¶ 56. The allegedly false advertising statements fall into two broad categories.

The first category includes statements that allegedly make the implicitly false or misleading representation that the iOnRoad app complies with government and automotive industry safety standards by describing the app as a car safety app and by employing automotive industry

---

11. The parties agree that these federal and state-law causes of action are substantively coextensive as applied to the facts of this case.

terminology to describe the app's functions. For instance, the Google Play description of the iOnRoad app stated that the app provides "Forward Collision Warning" and "Lane Departure Warning," which, construing the facts most favorably to Mobileye, are terms of art in the ADAS industry connoting a minimum level of performance and compliance with safety standards set by private industry and the National Highway Transportation Safety Administration ("NHTSA"). *Id.* ¶¶ 9, 18, 24, 132. Based on tests performed by an independent contractor hired by Mobileye, the iOnRoad app does not meet NHTSA's test specifications for FCW and LDW, nor, by implication, does it meet the stricter private industry test specifications. *Id.* ¶¶ 7, 73. That said, Mobileye has identified no statement by iOnRoad that expressly claims government approval of its app.

The second category of allegedly false advertising statements includes statements that compare and contrast the iOnRoad app with Mobileye and other similar ADAS systems. Mobileye alleges that these statements falsely or misleadingly omit relevant differences between the two types of products relating to safety and performance. For example, iOnRoad's website stated, "iOnRoad is the affordable alternative to expensive collisions avoidance systems such as Mobileye." *Id.* ¶ 57.

In order to show the how consumers viewed iOnRoad's advertising statements, Mobileye retained a consumer survey expert, Eugene Erickson, a former professor of sociology and statistics and a consultant with NERA Economic Consulting. Erickson conducted two surveys regarding consumers' perception of certain statements in the Google Play description of the iOnRoad app. Aff. of Eugene Erickson, ex. 1, at 7–8. These surveys were designed to determine (1) "the extent to which consumers perceived iOnRoad to be an app that would increase driving safety by effectively preventing collisions and other accidents," (2) "the extent to which the iOnRoad ads create the allegedly false impression that the phone app meets product standards typically understood to be used in the automobile industry," and (3) "whether or not iOnRoad ads create the allegedly false impression that it is the same or similar to systems used in luxury cars that cost $1,000." *Id.* at 2. iOnRoad did not conduct any competing survey.

In Erickson's first survey, the Auto Standards Survey, Erickson's team interviewed a sample of 199 respondents who are drivers and smartphone owners. After viewing the ad, respondents were first asked what they considered to be its main message, and then were asked questions about three specific features of the app: FCW, LDW, and temperature detection. The third feature, temperature detection, did not actually appear in the ad; the questions about it served to provide a control measure of so-called "yea-saying," that is, respondents' tendency to say "yes" to any question they are asked. *Id.* at 3.

For each of the features, the respondents were asked whether the app mentioned the feature and whether they believed the feature complied with automobile industry safety standards and NHTSA safety standards. *Id.* After netting out "yea-sayers," Erickson found that 71.3 percent of respondents noticed the FCW feature, and 43.7 noticed the LDW feature. *Id.* at 15. Erickson further found, again after netting out "yea-sayers," that 25.6 percent of respondents believed that the FCW feature complied with industry standards, and 15.6 percent believed that the LDW feature did so. After netting out respondents who did not notice the feature in question, those figures increased to 35.0 percent and 34.3 percent, re-

spectively. The numbers for the questions regarding government safety standards are similar: net of "yea-sayers," 24.1 percent of respondents believed that the FCW feature complied with NHTSA standards, and 14.1 percent so believed for the LDW feature. Netting out respondents who did not notice the features in question yielded figures of 33.8 percent and 32.4 percent, respectively. *Id.* at 16.[12]

The second survey, the Comparative Ad Survey, involved a test group of 190 respondents and a control group of 206, with respondents randomly allocated between the two groups. *Id.* at 3, 17. The test group was shown a Google Play description of the iOnRoad app containing the statement, "Similar systems in luxury cars cost more than \$1,000 while iOnRoad is FREE," while the control group was shown the same ad with that statement omitted. *Id.* at 3. The members of each group were then asked, *inter alia*, whether the ad contained the statement and what they thought the statement means. *Id.* at 3–4.

Erickson found that, net of the control group, 38.1 percent of respondents noticed the statement in question. *Id.* at 17. Erickson further found that, again net of the control group, 17.7 percent of respondents indicated that the statement meant that the app and similar systems in luxury vehicles either had the same features, employed similar technologies, or were substi-

tutes for one another. *Id.* at 17–18. When respondents who indicated the statement meant that the app was a good deal are added in, that figure increases to 23.0 percent. *Id.* at 18–19. And after netting out respondents who did not notice the statement in question, those two figures increase to 45.6 percent and 56.7 percent, respectively. *Id.* at 19.

The respondents in the Comparative Ad Survey were also asked how they believed the overall performance of the app compares to that of similar systems in luxury cars. Fifteen percent of the test group and 4 percent of the control group reported that they had no opinion on this question. After netting out those non-responses, as well as the control group, Erickson found that 9.2 percent of respondents indicated that the performance of the app was the same or better than similar systems in luxury cars. *Id.*[13]

■ In addition to a consumer survey expert, Mobileye also retained a damages expert, Jonathan Putnam of Charles River Associates. In his expert report, Putnam opined that if iOnRoad's advertisements lead consumers to believe that the iOnRoad app is comparable to Mobileye and other ADAS systems in luxury vehicles, the ads would distort the demand for collision safety products and thus harm Mobileye in two ways:

First, consumers who used the iOnRoad app and were disappointed in its perform-

**12.** iOnRoad contends that these conclusions are unreliable because there is no evidence that respondents knew anything about the relevant government or industry safety standards. This argument misses the point of the survey. The undisputed facts show that the iOnRoad does not meet NHTSA and industry test specifications. Whatever those specifications require, the survey measures the percentage of respondents who believe, based on iOnRoad's advertising statements, that the app complies with them.

**13.** iOnRoad argues that these conclusions are unreliable because there is no evidence that respondents had any experience with luxury car systems. This argument again misses the point of the survey, which is not to evaluate the actual differences between the iOnRoad app and luxury car systems, but rather consumer perceptions of those differences based on iOnRoad's advertising statements.

ance would lose faith in ADAS systems generally, believing that the app's performance was representative of that market as a whole. This would lead car manufacturers to order fewer ADAS systems to incorporate into their vehicles, and would also lead consumers to purchase fewer aftermarket ADAS systems. Pls.' Nonpatent 56.1 ¶ 129. Mobileye currently holds between 60 and 80 percent of the U.S. market for ADAS systems. *Id.* ¶ 6.

Second, consumers who would otherwise have purchased Mobileye products would buy the iOnRoad app instead, believing the two products to be comparable in all relevant respects except price. Indeed, taking marketshare from Mobileye was an express part of iOnRoad's business strategy. *Id.* ¶ 27.

iOnRoad objects to the entirety of the Putnam report on the ground that it constitutes unsupported conjecture that is inadmissible under Federal Rule of Evidence 702. Defs.' R. 56.1 Obj. and Resp. to Pls.' Nonpatent 56.1 ¶ 129. The Court agrees as to Putnam's statements regarding the first of these two alleged harms summarized above, and therefore strikes that portion of Putnam's report. However, on the present state of the record, the Court cannot say that Putnam's statements as to the second of the alleged harms do not pass muster under Rule 702. So, without prejudice to further challenges at the time of trial, the Court, for purposes of this motion, allows this second portion of Putnam's report to stand. It should be noted, however, that Putnam declined to quantify the damages to Mobileye resulting from the alleged harm. Putnam explained that the bulk of the injury will take the form of harm to Mobileye's reputation, which, if uncorrected, will primarily manifest itself as lost sales in the future. *Id.* ¶ 128.

#### b. Discussion

 To make out a claim of false advertising under the Lanham Act, a plaintiff must show, among other things, a commercial advertising statement that is false. 15 U.S.C. § 1125. A plaintiff shows falsity by proving that the statement "is either (1) literally false, as a factual matter; or (2) implicitly false, *i.e.*, although literally true, still likely to mislead or confuse consumers." *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F.Supp.2d 402, 417 (S.D.N.Y.2006). The distinction between these two types of falsity is important, because where the plaintiff proceeds on a theory of implied falsity, the plaintiff "must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers." *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992). This extrinsic evidence typically takes the form of a consumer survey showing that a substantial percentage of consumers perceive the ad in the misleading or confusing manner that the plaintiff alleges. *Id.* at 298. Claims of literal falsity, however, do not require such extrinsic evidence. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)

 A challenged statement may be literally false, as opposed to impliedly false, in two ways. First, the statement may simply be false "on its face" if it makes an express factual claim that is untrue. *Id.* at 157–58. Second, the statement may be "false by necessary implication" if "the words or images, considered in context, necessarily imply a false message." *Id.* at 158. However, a statement can be false by necessary implication only if it is unambiguous. If the statement is susceptible to more than one reading, then the statement is at most impliedly false,

and thus is actionable only if supported by extrinsic evidence as to how it is perceived by consumers. *Id.*

In addition to falsity, a false advertising claim also requires a showing of harm to the plaintiff. 15 U.S.C. § 1125. Here, iOnRoad seeks summary judgment on the ground that, as a matter of law, Mobileye has insufficient evidence of both falsity and harm.

#### i. Falsity

■ In analyzing falsity, the Court addresses each of iOnRoad's two categories of allegedly false statements in turn. In the first category of statements, Mobileye alleges that iOnRoad has literally or impliedly claimed that its app complies with NHTSA and industry testing standards by describing the app as a car safety product and using ADAS industry terms. In arguing in response that these statements are not actionable, iOnRoad points to two cases from this district holding that where a plaintiff alleges that an advertisement falsely claims government approval of a product, the claim may proceed only on a theory of literal falsity. *See Merck & Co.,* 425 F.Supp.2d at 417; *Avon Products, Inc. v. S.C. Johnson & Son, Inc.,* 984 F.Supp. 768, 796 (S.D.N.Y.1997). iOnRoad further argues that none of its challenged statements expressly or unambiguously claims compliance with any safety standard, and thus cannot be literally false in the way Mobileye claims. Mobileye responds that *Merck* and *Avon* merely stand for the proposition that a Lanham Act plaintiff cannot prevail simply by showing noncompliance with a government regulation, but rather must also show a false or misleading statement. Mobileye contends that it has done that here, and also has produced adequate proof of consumer confusion in the form of Erickson's Auto Standards Survey.

The Court concludes that iOnRoad has the better reading of *Merck* and *Avon.* The cases clearly hold that, "absent an explicit claim that a product has been approved by the relevant federal agency or that the product meets federal standards, a Lanham Act plaintiff must prove that the defendant's efficacy claims are literally false, not simply that they fail to meet current federal [regulatory] standards." *Id.* at 797; *see also Merck,* 425 F.Supp.2d at 417 ("False advertising claims based on allegations of implied governmental approval have not been allowed, for 'the law does not impute representations of government approval ... in the absence of explicit claims.'" (quoting *Avon,* 984 F.Supp. at 796)). The cases reason that to allow governmental approval claims to proceed on allegations of mere implied falsity would transform the Lanham Act from a focused consumer protection statute into a wide-ranging vehicle for private enforcement of federal regulations. *See id.* (citing *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1132 (4th Cir.1993)); *Avon,* 984 F.Supp. at 796 (same). While decisions of fellow district courts and of the Fourth Circuit are not binding on this Court, the Court finds this line of reasoning eminently persuasive.

The logic of these cases, however, extends only to advertising statements alleged to claim compliance with governmental safety standards, and not standards set by private industry. According to *Merck, Avon,* and *Mylan Labs.,* the primary problem with allowing governmental approval claims to proceed on a theory of implied falsity is that it would essentially permit private enforcement of government standards when Congress has not provided a private cause of action and has instead entrusted enforcement to the relevant public agency. That problem does not exist when applicable safety standards are not set or enforced by the government. Mobileye's claims relating to industry testing specifications may therefore proceed on a theory of implied falsity, and thus survive summary judgment, based on the extrinsic

evidence contained in the Auto Standards Survey.[14] Mobileye's claims relating to NHTSA testing specifications, however, must proceed on a theory of literal falsity, and because Mobileye has identified no express or unambiguous representations of compliance with any safety standards, those claims must be dismissed.

iOnRoad's second category of alleged false advertisements are statements that compare and contrast the iOnRoad app with Mobileye and other similar ADAS systems while omitting differences relating to safety and performance. iOnRoad seeks summary judgment dismissing the claims based on these statements on two grounds. First, iOnRoad argues that because none of the challenged statements purports to provide an exhaustive list of differences between the iOnRoad app and similar ADAS products, none of the statements is literally false, and thus any literal falsity claim must fail. Second, as to any implied falsity claim, iOnRoad contends that Mobileye has produced insufficient extrinsic evidence that the statements are misleading. iOnRoad points out that Erickson's Comparative Ads Survey shows that only 17.7 percent of respondents perceived a message that iOnRoad's app and similar ADAS systems are the same, similar, or substitutes for one another, and that only 9.2 percent of respondents perceived a message that the app has the same or better performance than similar ADAS systems. Both of these figures are below 20 percent, which iOnRoad contends is the threshold for the requisite "substantial percentage of consumers," citing *Procter & Gamble Co.*

*v. Ultreo, Inc.*, 574 F.Supp.2d 339, 345–46 (S.D.N.Y.2008). In addition, iOnRoad notes that there is no evidence that any consumers have complained about iOnRoad's statements.

In response to iOnRoad's literal falsity arguments, Mobileye points to one statement on iOnRoad's website claiming that the difference between iOnRoad's app and "similar systems in luxury vehicles" is that iOnRoad "offer[s] much more information besides beeps." Pls.' Nonpatent 56.1 ¶ 47. Mobileye argues that that statement is false on its face, since Mobileye's ADAS systems also offer information "besides beeps," and, moreover, there are no features in the iOnRoad app that are not also available in similar ADAS systems like Mobileye's. As to iOnRoad's implied falsity arguments, Mobileye contends that the relevant figure from the Comparative Ads survey is 23 percent, which is the portion of respondents who perceived a message that the app is a good deal or that the app and similar ADAS systems are the same, similar, or substitutes. And even accepting iOnRoad's arguments as to the relevant figure, Mobileye contends that there is no 20 percent threshold, and that in the closely related context of consumer confusion in trademark infringement cases, courts have accepted figures as low as 7.7 or 7.3 percent. *See Tri–Star Pictures, Inc. v. Unger*, 14 F.Supp.2d 339, 357 n. 16 (S.D.N.Y.1998); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F.Supp. 707, 709 (S.D.N.Y.1973) *aff'd as modified on other grounds*, 523 F.2d 1331 (2d Cir.1975).[15]

**14.** The Court notes that Mobileye's claims relating to industry safety standards rise and fall on the Auto Standards Survey, and further notes that that survey only questioned consumers about iOnRoad's Google Play advertisements, and not about any other challenged advertisements. But viewing the evidence in the light most favorable to Mobileye, the Court finds that the statements in the

Google Play advertisements are sufficiently similar to iOnRoad's other advertising statements that a reasonable jury could find that consumers perceive those other advertising statements in a similarly misleading way.

**15.** Mobileye also contends that the fact that iOnRoad has removed many of the challenged statements from its website is a tacit admis-

In its "bottom-line" order on this motion, the Court initially granted iOnRoad's motion on this category of challenged statements. After all, with the exception of the statement regarding "beeps," none of the challenged statements appears to be false on its face, and any claim of falsity by necessary implication is belied by the fact that none of the statements purports to exhaust all differences between the two products. Furthermore, as to implied falsity, while Mobileye stresses that iOnRoad's ads give 23 percent of consumers the supposedly misleading impression that the two products are similar, Mobileye itself in its trademark argument contends that iOnRoad and Mobileye are competitors, who, by definition, must offer products similar enough that consumers cross-substitute.

However, upon closer review of the Comparative Ads Survey—which, on summary judgment, the Court must view in the light most favorable to Mobileye—it appears that the statement "Similar systems in luxury cars cost more than $1,000 while iOnRoad is FREE" leads 9.2 percent of consumers to believe that the overall performance of the iOnRoad app is equal to or better than that of similar systems in luxury cars. Moreover, as iOnRoad's counsel conceded at oral argument, neither *Procter & Gamble* nor any other case recognizes any hard threshold for what constitutes the requisite substantial percent-

age of consumers who must be mislead. *See* Tr. at 64. Ultimately, while 9.2 percent is not overwhelming, the Court cannot conclude that it is insubstantial as a matter of law. Based on the Comparative Ads Survey, a reasonable jury could find that the comparison's between iOnRoad's app and similar systems in luxury vehicles are impliedly false and mislead a substantial percentage of consumers.[16]

### ii. Harm

In addition to falsity, iOnRoad also argues that Mobileye has presented insufficient evidence of harm to survive summary judgment. Mobileye's damages expert, Putnam, has not calculated lost sales, lost revenues, or lost profits suffered by Mobileye as a result of iOnRoad's alleged false advertising; and, according to iOnRoad, Mobileye has no reputation among consumers to be harmed. Mobileye responds that Putnam opined as to two ways in which iOnRoad's false advertising injures Mobileye, including by diminishing demand for a category of products in which Mobileye holds between 60 and 80 percent of the market. Mobileye further argues that because its injuries are difficult to quantify and will continue into the future if left uncorrected, they are irreparable. *See McNeilab, Inc. v. Am. Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988) (holding that where a plaintiff presents evidence of actual injury caused by false advertising, irreparable harm is presumed).

---

sion that those statements are at least impliedly false, citing this Court's decision in *Philip Morris USA Inc. v. Cowboy Cigarette Inc.*, No. 03 Civ. 2292(JSR), 2003 WL 22852243, at *7 (S.D.N.Y. Dec. 2, 2003). But Federal Rule of Evidence 407 clearly prohibits the introduction of subsequent remedial measures to prove culpable conduct. Mobileye's citation to *Philip Morris USA* is misplaced; there, the Court was not inferring culpable conduct, but was rather inferring, based on the conduct of third parties, that the plaintiff's trademark was strong.

**16.** As with the first category of challenged statements, Mobileye's implied falsity claim depends on Erickson's Comparative Ads Survey, which only evaluated a single statement as part of iOnRoad's Google Play advertisement. For purposes of summary judgment, however, the Court finds that iOnRoad's other statements comparing the iOnRoad app to luxury car ADAS systems are sufficiently similar to the Google Play statements that a reasonable jury could find that consumers perceive those other advertising statements in a similarly misleading way.

Even after eliminating all reference to the portion of Putnam's report stricken above, the Court finds that, based on the remainder of the report, Mobileye has made out a case of likely future injury. However, since Mobileye has made no attempt to quantify the harm it has so far suffered from iOnRoad's false advertising, iOnRoad's motion for summary judgment is granted to the extent Mobileye seeks damages. But to the extent Mobileye seeks only injunctive relief, it has presented sufficient evidence to persuade a reasonable trier of fact that it has and will be irreparably harmed, making summary judgment inappropriate.

### 3. Trademark Infringement and Unfair Competition Claims

#### a. The Facts

■■■ Mobileye's next claim is for trademark infringement under federal law and, relatedly, unfair competition under New York state law.[17] Mobileye holds a registered trademark in the name MOBI-LEYE. *See* MOBILEYE, Registration No. 3,150,324. Mobileye began using the mark in commerce in 2001, filed for registration in 2002, and obtained registration in 2006. *Id.* In conjunction with the use of the mark, Mobileye has also used the slogan "acts like a third eye on the road" in its promotional materials for several years, although this slogan is not a registered trademark. Pls.' Nonpatent 56.1 ¶ 86. Viewing the facts in Mobileye's favor, it appears that iOnRoad analyzed, monitored, and imitated Mobileye's slogan, product terminology, performance, visual appearance, sound effects, and overall trade image. *Id.* ¶¶ 62–64, 85–88, 114–16. The Court notes, however, that Mobileye has not asserted a trade dress claim in this action.

#### b. Discussion

■■■ To prevail on a claim of trademark infringement, a plaintiff must prove that the plaintiff owns a valid, registered mark, that the defendant used that mark or a colorable imitation thereof without consent in connection with the sale or advertising of goods or services, and that the use of the allegedly infringing mark is likely to cause consumer confusion about the origin or sponsorship of those goods or services. 15 U.S.C. §§ 1114(1), 1125(a). In determining whether there is a likelihood of consumer confusion, courts apply the eight-factor balancing test announced in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 493 (2d Cir.1961). The eight factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 115 (2d Cir.2009). The Court accordingly takes each these factors in turn.

■■■ The first factor, the strength of the mark, refers to the mark's distinctiveness, that is, its capacity for identifying goods or services as emanating from a particular source. *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). Distinctiveness may be inherent or acquired. Inherent distinctive-

---

**17.** Courts "analyze claims [for trademark infringement] under New York's unfair competition statute in a similar fashion to how [they] analyze claims under the Lanham Act." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 119 (2d Cir.2006).

ness comes from the characteristics of the mark itself, while acquired distinctiveness comes from an association with a particular source—so-called "secondary meaning"—that builds up over time from the mark's use in commerce. *See Medici Classics Productions, LLC v. Medici Group, LLC*, 683 F.Supp.2d 304, 309 (S.D.N.Y.2010).

When analyzing distinctiveness, courts classify marks into four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary or fanciful. *Id.* As relevant here, arbitrary or fanciful marks are considered strong without proof of acquired secondary meaning. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 385 (2d Cir.2005). Suggestive marks, on the other hand, while entitled to trademark protection without evidence of secondary meaning, require a showing of secondary meaning in order to be considered strong. *Id.* ("In the absence of any showing of secondary meaning, suggestive marks are at best moderately strong.") When analyzing secondary meaning, courts typically consider six factors: "(1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue." *Medici Classics*, 683 F.Supp.2d at 310 (citing *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985)).

Here, iOnRoad contends that MOBILEYE is a suggestive mark, that is, a mark that evokes a defining characteristic of the associated product. *Id.* Mobileye manufactures single-camera-based driver assistance systems; iOnRoad argues that the first part of the mark, "MOBIL," evokes motion or transportation, and the

second part, "EYE," evokes vision. iOnRoad further argues that Mobileye has insufficient evidence to establish secondary meaning. To begin with, Mobileye points to no consumer surveys linking the MOBILEYE mark to Mobileye products in the United States, nor to any attempts at plagiarism by third parties. Defs.' Am. R. 56.1 Statement in Supp. of their Mots. for Summ. J. on Mobileye's Non–Patent Claims ("Defs.' Nonpatent 56.1") ¶¶ 46, 48. Indeed, Mobileye's own survey expert opined that Mobileye is not well-known among the general consuming public. Erickson Aff., ex. A, at 4. As for sales success, Mobileye, Inc.'s yearly gross profits in the last few years have never exceeded $1 million, and net profits have never exceeded $62,000. Defs.' Nonpatent 56.1 ¶¶ 52–55. During the same period, Mobileye Technologies, Inc. showed annual net losses of more than $10 million. *Id.* ¶¶ 56–59.

In response, Mobileye first argues that MOBILEYE is a fanciful, rather than suggestive mark, because it is a neologism coined solely for use as a trademark. Mobileye also argues that even if its mark is merely suggestive, it is nevertheless strong because Mobileye ADAS systems have received a large amount of publicity and unsolicited press coverage, have won numerous awards, and are frequently featured in industry conferences. Pls.' Nonpatent 56.1 ¶¶ 107–11. Mobileye further notes that its marketing efforts have been "extensive," and that its systems enjoy wide circulation among virtually all major car companies and fleets. *Id.* ¶¶ 110, 112.

The Court concludes that Mobileye has presented sufficient evidence to show, for purposes of summary judgment, that MOBILEYE is a moderately strong mark. This is true notwithstanding the fact that the mark is clearly suggestive, not fanciful, for the term "Mobileye," even though it is

a neologism, plainly evokes the essential characteristics of a vision-based automotive product. Indeed, Mobileye effectively concedes as much in its argument on similarity, where it contends that "Mobileye" and "iOnRoad" both "conjure up the same fanciful imagery of an automobile eye." Pls.' Mem. of Law in Opp'n to Defs.' Mot for Summ. J. on Mobileye's NonPatent Claims at 17. On the other hand, while Mobileye points to no relevant consumer surveys or plagiarism attempts, Mobileye's products appear to have enjoyed commercial success and have garnered unsolicited press and attention within the automobile safety industry. Accordingly, while the Court cannot conclude that a reasonable jury would find the mark as strong as if it were fanciful or arbitrary, the record also would not compel a reasonable jury to find the mark weak either.

■■■ The Court thus turns to the second *Polaroid* factor, the similarity of the two marks, MOBILEYE and "iOnRoad." Similarity is a holistic consideration that turns on the overall commercial impression given by a mark under the totality of the circumstances. *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir.2005). Here, iOnRoad contends that the two marks are dissimilar in sight, sound, and overall commercial impression. Mobileye responds that, to the contrary, both marks evoke an automotive eye. Mobileye further contends that "iOnRoad" is remarkably similar to Mobileye's long-used slogan, "a third eye on the road," and notes that iOnRoad's app imitates many aspects of Mobileye's features and marketing language.

But as noted above, Mobileye holds no trademark in its slogan, and it has not asserted a trade dress claim in this case. Moreover, in the end, the two marks share nothing beyond a single syllable ("I" or "EYE") and an evocation of a vision-based automotive product. This might lead consumers to believe that the goods sold under these two marks belong to the same market, but is unlikely to confuse consumers as to the source or sponsorship of the goods. The Court thus concludes that the two marks are at best very weakly similar.

The third and fourth *Polaroid* factors are the proximity of the products and the possibility of the senior user "bringing the gap" into the junior user's market. These two factors "focus on the degree to which the products currently compete with each other or are likely to compete with each other in the future." *Medici Classics*, 683 F.Supp.2d at 311–12. iOnRoad asserts flatly that the two products do not compete in the same market, and cites to deposition testimony in which Mobileye executives stated that iOnRoad is not a competitor. Defs.' Nonpatent 56.1 ¶¶ 21–22. Mobileye responds that, read in context, the cited deposition testimony shows that iOnRoad and Mobileye actually do compete, although Mobileye does not currently view iOnRoad as a serious competitive threat. Mobileye further notes that iOnRoad's own advertisements claim that the two products are directed at the same problem and the same consumers. Pls.' Nonpatent 56.1 ¶¶ 118–19.

The Court concludes that iOnRoad and Mobileye are in fact competitors, and are likely to continue to compete in the future. Indeed, iOnRoad's very comparative advertisements themselves provide strong evidence that the two companies are competitors.

As for the fifth *Polaroid* factor, actual consumer confusion, Mobileye concedes that it has no evidence of such confusion at this stage.

The sixth factor concerns whether the allegedly infringing mark was chosen in bad faith. iOnRoad contends that there is no evidence in the record that it adopted the trade name "iOnRoad" in bad faith, or,

indeed, why it was adopted at all. Mobileye asserts in response that there is ample evidence that iOnRoad deliberately aped Mobileye trade image, including its slogans, terminology, and appearance. In fact, Mobileye contends that iOnRoad's deception is so egregious that it shifts the burden to iOnRoad to show the absence of consumer confusion. *See Res. Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991).

The problem with Mobileye's argument is that, again, its claim here is for infringement of the mark MOBILEYE, not its unregistered slogan or its trade dress. Moreover, the Court has already concluded that the two marks are at best weakly similar, negating any finding of deliberate copying. Accordingly, the Court finds burden shifting to be unwarranted. Nevertheless, a reasonable jury could find based on iOnRoad's surrounding conduct regarding Mobileye's overall trade image that it adopted the "iOnRoad" name with the intent to capitalize on Mobileye's goodwill.

The seventh factor in the *Polaroid* analysis is the quality of the respective products at issue. The undisputed evidence shows that the iOnRoad app fails certain government and industry safety tests that Mobileye's systems pass. Indeed, iOnRoad appears to concede this factor by failing to address it in its reply brief.

The eighth and final *Polaroid* factor concerns the sophistication of the relevant consumers. iOnRoad contends that the car manufacturers, fleet managers, and rental car companies who are Mobileye's primary customers are prototypically sophisticated consumers. Generally, "the more sophisticated the consumer, the less likely they are to be misled by similarity in marks." *Medici Classics*, 683 F.Supp.2d at 314. Mobileye, however, argues that here, even if its customers are unusually sophisticat-

ed, that would actually make them more likely to be aware of Mobileye's brand and hence to make a mental association between "iOnRoad" and "Mobileye." *See Philip Morris USA*, 2003 WL 22852243, at *12 (holding that more sophisticated consumers were "more likely to perceive seeming connections between Marlboro and Cowboy cigarettes"). On balance, the Court concludes that, without knowing much more about the particulars of the market, this factor does not strongly favor either side.

Reviewing the eight *Polaroid* factors, the Court finds that two factors, the similarity of the marks and actual consumer confusion, favor granting iOnRoad's motion for summary judgment. One factor, consumer sophistication, is neutral. The remaining five factors—strength of the mark, proximity of the products, "bridging the gap," bad faith, and quality of the products—to varying degrees weigh towards denying the motion. Thus, although *Polaroid* analysis is not generally reducible to a mechanical counting exercise, a clear majority of factors here weigh in Mobileye's favor. Moreover, the Second Circuit has explained that strength, similarity, and proximity are generally the three most important *Polaroid* factors, and two of those three critical factors favor Mobileye here. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987). In these circumstances, the Court is compelled to deny iOnRoad's motion for summary judgment.

### 4. Trademark Dilution Claims

Mobileye next asserts claims for trademark dilution under federal and state law.

#### a. Federal Trademark Dilution

A federal trademark dilution claim has three elements: ownership of a famous, distinctive mark by the plaintiff; use of a mark or trade name in commerce by the

defendant; and a likelihood that defendant's use will dilute plaintiff's mark through "blurring" or "tarnishment." 15 U.S.C. § 1125(c). The statute defines a famous mark as one that "is widely recognized by the general consuming public of the United States as a designation of the goods or services of the mark's owner." *Id.* § 1125(c)(2)(A). Factors relevant to a determination of fame include the extent of publicity of the mark, the extent of sales under the mark, and the extent of actual recognition of the mark. *Id.*

■ Here, iOnRoad argues that that there is insufficient evidence that MOBILEYE is a famous mark. Mobileye's own expert, Dr. Erickson, stated in his expert report that "[w]hile Mobileye is a recognizable name [among car manufacturers, fleet managers, and car rental companies], it is at this point less well-known among the general consuming public." Erickson Aff., ex. A, at 4. Erickson further opined that "Mobileye and iOnRoad are new products[,] and . . . most consumers are familiar with neither." *Id.* Mobileye's response essentially repeats and cross-references the arguments it raised in its trademark infringement claim as to why MOBILEYE has acquired secondary meaning.

The Court finds that the direct representations quoted from the report of Mobileye's own survey expert dispose of this claim. And if that were not enough, the Court has already noted that the evidence is rather weak that Mobileye's mark has even acquired secondary meaning, much less that it is "widely recognized by the general consuming public of the United States." MOBILEYE simply is not a famous mark. The Court thus need not address iOnRoad's alternative arguments that Mobileye has not adequately shown blurring or tarnishment.

 b. State–Law Trademark Dilution

■ New York's General Business Law § 360–*l* creates a cause of action for

trademark dilution with two elements: "(1) a distinctive mark capable of being diluted, and (2) a likelihood of dilution." *Precisi-onFlow Technologies, Inc. v. CVD Equip. Corp.*, No. 1:99–CV1536, 2007 WL 844893 (N.D.N.Y. Mar. 19, 2007). Under section 360–*l*, unlike federal law, the plaintiff's mark "need not be need not be famous or celebrated, but it must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning." *Energy Intelligence Group, Inc. v. UBS Fin. Services, Inc.*, No. 08 Civ. 1497(DAB), 2009 WL 1490603 (S.D.N.Y. May 22, 2009) (internal quotation marks omitted).

Moreover, as Judge Holwell has explained, another "key difference" between federal and New York-state dilution claims

> is that New York law does not permit a dilution claim unless the marks are 'substantially' similar. The substantial similarity test requires more than the familiar test of similarity used in the traditional infringement context. Marks must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same.

*Miss Universe, L.P., LLLP v. Villegas*, 672 F.Supp.2d 575, 595–96 (S.D.N.Y.2009) (internal quotation marks and citations omitted) (holding that " 'Miss Asia USA' is not similar enough to 'Miss USA' " to survive summary judgment under this standard).

■ iOnRoad argues that Mobileye cannot satisfy this requirement of substantial similarity, and the Court agrees. As the Court explained above, MOBILEYE and IONROAD are at best weakly similar, and thus are far from being so similar that any consumer will view them "as essentially the same."

### 5. Remaining State–Law Claims

Mobileye's remaining causes of action are state-law claims for deceptive acts and practices, misappropriation, and unjust enrichment.

#### a. Deceptive Acts and Practices

 New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." While competing businesses have standing to sue under this provision, it is, "at its core, a consumer protection device," and thus "the gravamen of the complaint must be consumer injury or harm to the public interest," not mere competitive disadvantage. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995) (internal quotation marks omitted). Accordingly, "for the statute to apply, a plaintiff must establish a direct harm to consumers that is greater than the general consumer confusion commonly found in trademark actions," such as "potential danger to the public health or safety." *Eliya, Inc. v. Kohl's Dept. Stores*, No. 06 Civ. 195(GEL), 2006 WL 2645196, at *7 (S.D.N.Y. Sept. 13, 2006).

 Here, iOnRoad contends that Mobileye has at most shown consumer confusion, and not danger to public health or safety. Mobileye disagrees, contending that misleading the public about the whether the app complies with government and industry safety standards raises safety concerns.

Although Mobileye's argument is not without some superficial appeal, the Court must reject it. As iOnRoad explains, even if Mobileye has presented evidence that consumers are confused about whether the app complies with relevant safety standards, Mobileye points to no evidence in the record that the app is actually dangerous or unsafe. Accordingly, Mobileye's deceptive acts and practices claim must be dismissed.

#### b. Misappropriation

 As the Second Circuit has explained, misappropriation is an "amorphous cause of action" that "has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor and misappropriating for the commercial advantage of one person a benefit or property right belonging to another." *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.*, 683 F.2d 704, 710 (2d Cir.1982) (internal quotation marks omitted). While this tort is "adaptable and capacious," *id.*, it does require a showing of bad faith. *See Spiel Assocs., Inc. v. Gateway Bookbinding Sys., Ltd.*, No. 03CV4696 FB (RLM), 2010 WL 546746, at *13 (E.D.N.Y. Feb. 16, 2010). Cross-referencing the arguments from the bad faith prong of the *Polaroid* analysis, iOnRoad contends that there is insufficient evidence of bad faith; Mobileye disagrees. For the reasons stated above in its *Polaroid* analysis, the Court finds that there is adequate evidence of bad faith here, and denies iOnRoad's motion on this claim.

#### c. Unjust Enrichment

 To prevail on a claim of unjust enrichment, a plaintiff must show that "(1) the defendant was enriched; (2) at plaintiff's expense; and (3) equity and good conscience require restitution." *Coca–Cola N. Am. v. Crawley Juice, Inc.*, No. 09 CV 3259 JG RML, 2011 WL 1882845, at *10 (E.D.N.Y. May 17, 2011). iOnRoad argues simply that there is no evidence that it has been enriched at Mobileye's expense. Mobileye responds that all of iOnRoad's revenue from downloads of the iOnRoad app represent unjust enrichment. Since Mobileye has answered iOnRoad's sole argument on this issue, the Court must deny iOnRoad's motion on this claim.

## Conclusion

For the reasons stated above, the Court hereby confirms its "bottom-line" order of January 15, 2013, insofar as it granted summary judgment dismissing Mobileye's claims for patent infringement, trademark dilution, and deceptive acts and practices. The Court also confirms its earlier order insofar as it denied summary judgment on the claims for trademark infringement, misappropriation, and unjust enrichment. As to Mobileye's federal and state-law claims for false advertising, the Court confirms its earlier ruling dismissing those claims to the extent that they rest on allegedly impliedly false representations of government approval. To the extent that the false advertising claims rest on other allegedly false or misleading representations and omissions, however, the Court denies summary judgment.

SO ORDERED.