**AKIRO LLC, Plaintiff,**

v.

**HOUSE OF CHEATHAM, INC. and Robert H. Bell, Defendants.**

**No. 12 Civ. 5775 (JSR).**

United States District Court,
S.D. New York.

May 17, 2013.

---

Matthew Adam Pek, Guzov Ofsink, New York, NY, D. Reeves Carter, McDermott, Will & Emery, New York, NY, for Plaintiff.

Mercedes Colwin, Gordon & Rees, LLP, Michael John Vollbrecht, Gorlick, Kravitz & Listhaus, P.C., Ryan James Sestack, Wilson Elser Moskowitz Edelman & Dicker LLP, New York, NY, for Defendants.

## MEMORANDUM

JED S. RAKOFF, District Judge.

Plaintiff Akiro LLC ("Akiro") filed this action against defendants House of Cheatham, Inc. ("HOC") and Robert H. Bell, asserting claims for trademark infringement and false designation of origin under the Lanham Act, and for unfair competition and trademark dilution under New York law. By stipulation and order signed by the Court on March 4, 2013, the claims against defendant Bell have been dismissed with prejudice. The parties then cross-moved for summary judgment on all claims against defendant HOC. On April 12, 2013, the Court issued a "bottom-line" order granting HOC's motion in part and denying it in part, and denying Akiro's motion in full. Specifically, the Court denied both parties' motions with respect to the claims for trademark infringement, false designation of origin, and state-law unfair competition. As to the claim for trademark dilution, the Court denied Akiro's motion and granted HOC's motion, and thus dismissed the claim. This Memorandum explains the reasons for those rulings.

On summary judgment, the Court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Scottsdale Ins. Co. v. R.I. Pools Inc.*, 710 F.3d 488, 491 (2d Cir.2013). Summary judgment is appropriate "only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* Where the parties cross-move for summary judgment, the Court analyzes each motion separately, "in each case construing the evidence in the light most favorable to the non-moving

party." *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir.2011).

The following facts are undisputed unless otherwise noted. Akiro is the owner of a valid registration for the trademark MISS JESSIE'S, under which it sells a number of products in the so-called "natural and curly" hair product market. Pl.'s Statement of Undisputed Facts Pursuant to Local Civ. Rule 56.1(a) ("Pl.'s 56.1") ¶¶ 1, 4, 13.[1] This market primarily serves the growing number of African American women who choose not to chemically alter or "relax" their hair, instead allowing it to remain "natural" and curly. *Id.* ¶ 2.

Akiro has sold hair care products under the MISS JESSIE'S mark continuously and without interruption since at least 2003. *Id.* ¶¶ 4, 6. Over the last ten years, Akiro has expended considerable financial and other resources towards marketing and promoting goods under the MISS JESSIE'S mark. *Id.* ¶ 7. Akiro has participated in hair product trade shows, purchased advertising placements in a number of popular national magazines, placed ads on billboards and radio broadcasts, and hired publicists and public relations firms to promote products under the MISS JESSIE'S mark. *Id.* ¶ 8–9. Recently, MISS JESSIE'S was the official U.S. hair care product partner of the movie *Sparkle*, starring Jordin Sparks and Whitney Houston. *Id.* ¶ 10.

HOC is the owner of a valid registration for the trademark AUNT JACKIE'S, under which it sells its own line of products in the natural and curly hair product market. Def.'s Local Rule 56.1(a) Statement of Undisputed Material Facts ("Def.'s 56.1") ¶¶ 36, 41. HOC began exploring the possibility of entering this market in 2010. *Id.* ¶¶ 1–2. Between January 2010 and

---

1. Where cited by the Court, the parties' Rule 56.1 Statements are in agreement as to the proposition for which a given such Statement is cited, unless otherwise noted.

April 2012, HOC extensively researched this market, including interviewing retailers, visiting hair shows and salons, assessing existing products, reviewing industry data, and hiring a market researcher to conduct quantitative a survey of consumers at shopping malls. *Id.* ¶¶ 1–3. HOC's research showed that natural hair products associated with a personality or a person's name were most successful and popular, and that consumers in this market were relatively sophisticated in that they read product labels and research available products and styles. *Id.* ¶¶ 4–5.[2]

In December 2011, HOC determined that an opportunity existed in this market for products priced at an intermediate point between the so-called "premium" and "value" levels, and began developing a brand for this portion of the market. *Id.* ¶¶ 6–7.[3] As part of that development, according to Dwan White, HOC's Director of Marketing and Product Development, HOC conducted a number of product formula trials in a salon. *Id.* ¶ 8. According to White, the colors used in the test formulas, including the purple color that was eventually used in HOC's AUNT JACKIE'S "curl la la" product, came from the formulas of other existing HOC products. *Id.* ¶ 10.

On January 24, 2012, White forwarded a list of potential brand names to HOC's trademark counsel, Nathan Belzer, Esq., and asked his firm to search for conflicts with registered trademarks. *Id.* ¶ 11. The potential marks White forwarded all took the form "Ms. [name]'s True Natural Hair Therapies," with five names inserted:

Carol, Betty, Chelsea, Jenny, and Carter. *Id.* ¶ 12. White also forwarded potential product names to be searched for conflicts as well. *Id.* ¶ 13. One week later, White forwarded two additional potential brand names to Belzer—Lady Chelsea's True Natural Hair Therapies and Aunt Jenny's True Natural Hair Therapies. *Id.* ¶ 15.

On February 1, 2012, Belzer sent White a chart summarizing the results of the trademark searches and noting any issues with the proposed names. *Id.* ¶ 17. On February 3, 2012, White forwarded Belzer another two more potential names to search: Miss Jackie's (or Jacqui's) Coils and Curls and Miss Leslie's Coils and Curls, and on February 6, 2012, Belzer sent White an updated chart noting any issues for the new names. *Id.* ¶¶ 19–21. In that email, Belzer stated that, "[o]f the two [most recently proposed names], Leslie's was clearer than Miss Jackie's/Jacqui's." Aff. of Tit Branch ("Branch Aff."), ex. K, at DEF16. A week later, at Belzer's recommendation, White directed Belzer to apply to register the following trademarks on behalf of HOC: Miss Jackie's Curls and Coils, Oh So Clean!, La Creme, Curl La La, and Knot On My Watch, which Belzer proceeded to do. *Id.* ¶¶ 24–26.

White now states in her declaration that she "did not look at or review the Miss Jessie's brand and did not use Miss Jessie's as a model or template at any point in the development of Aunt Jackie's." Decl. of Dwan White, ¶ 10. On February 22, 2012, however, White forwarded to Belzer photos of proposed Miss Jackie's Curls &

---

**2.** Akiro disputes the statements in paragraphs 4 and 5 of Defendant's 56.1 on the ground that they mischaracterize the record, but Akiro offers no contrary citations to the record, and thus the Court, upon review of the underlying evidence cited by HOC, overrules Akiro's objections.

**3.** Akiro disputes the statements in paragraphs 6 and 7 of Defendant's 56.1 on the ground that they mischaracterize the record, but Akiro offers no contrary citations to the record, and thus the Court, upon review of the underlying evidence cited by HOC, overrules Akiro's objections.

Coils product packaging, as well as photos of existing MISS JESSIE'S product packaging. White explained:

> The images attached are of our new Miss Jackie's Curls & Coils brand and another competitor. A few brands in this natural hair category have trade dress that conveys a premium, old fashioned look and feel. That is the direction we have chosen too. We would like your opinion on whether there could be a high risk or strong argument for Miss Jackie's trade dress and the attached competitor's trade dress being confusingly similar.

Decl. of Mercedes Colwin, ex. C, at DEF56–58. Belzer responded:

> We may need to discuss this a bit. When I ran the search names, I did not know that you had specific competitors['] products in mind. The searches can't really be done in a vacuum. At the very least, the script of MISS JACKIE'S absolutely needs to change. I am also now concerned about the use of LA CREME. While Miss Jessie's was unsuccessful in getting a registration for CREME DE LA CREME, and there are other CREME marks out there, you really need to stay away from anything that Miss Jennie's [sic] is using.
>
> I think there is a risk that Miss Jennie's [sic] will complain about the trade dress overall and the MISS JACKIE'S mark specifically. I think you would have good arguments in defense of such a claim. But the having to defend the claim could be the problem. Taken individually, the elements are not confusingly similar. When taken as a whole (as

Miss Jennie's [sic] would argue), they get a bit closer.

*Id.* at DEF59. White and Belzer state that during a subsequent phone conversation involving White, Belzer, and two other HOC officials, Belzer recommended that HOC should consider changing the name "Miss" to something else. Def.'s 56.1 ¶ 29; Decl. of Nathan Belzer, ¶ 13. When White offered "Aunt," "Lady," and "Madam," Belzer recommended "Aunt." Def.'s 56.1 ¶ 30. During the conversation, however, Belzer reiterated his belief that the MISS JACKIE'S mark was not confusingly similar to the MISS JESSIE'S mark. *Id.* ¶ 31.[4]

Belzer then conducted further investigation into the AUNT JACKIE'S mark, concluded that it was not likely to be confused with any preexisting mark, and filed a new trademark application for that mark on March 2, 2012. *Id.* ¶¶ 32–33.[5] In an examiner's amendment issued on May 29, 2012, the assigned trademark examiner noted that "[t]he trademark examining attorney has searched the USPTO's database of registered and pending marks and has found no conflicting marks that would bar registration." *Id.* ¶ 35. HOC was later granted registration for the AUNT JACKIE'S mark, and began selling products under it in late June 2012. *Id.* ¶ 36, 41. AUNT JACKIE'S products are now available at beauty supply stores, retail outlets, big box chains, grocery stores, and pharmacies. *Id.* ¶ 38.

■ HOC also presents expert evidence in the form of two expert reports. The first is by Rob Wallace, managing partner

---

4. Akiro disputes the statements in paragraphs 20, 30, and 31 of Defendant's 56.1 on the ground that there is no "independent evidence" supporting these statements. Because the statements are supported by the declarations of White and Belzer, to which HOC cites, these objections are overruled.

5. Akiro disputes the statement in paragraph 32 of Defendant's 56.1 on the ground that it is contradicted by the evidence cited by HOC. Upon review of that evidence, the Court overrules this objection.

of a brand strategy consultancy and a purported expert in brand identity, strategy, and design. Expert Report of Rob Wallace ("Wallace Report"), ex. F to Colwin Decl., at 11. Wallace's report analyzes various aspects of the MISS JESSIE'S and AUNT JACKIE'S brands—including product names, fonts, color schemes, logo elements, and package structures—to determine whether consumers are likely to be confused between the two brands. Wallace concludes that consumers are "highly unlikely" to confuse or associate the two marks, and opines "that the Aunt Jackie's brand does not infringe on the M[i]ss Jessie's brand trademark." *Id.*

■ Akiro argues that the Wallace Report should be excluded from the summary judgment record because it is inadmissible under Federal Rule of Evidence 702 and the standards announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. *Daubert* sets forth a list of five nonexclusive factors for trial courts to consider in determining whether an expert's reasoning and methodology are sufficiently reliable to merit admission: (1) whether the methodology has or can be tested, (2) whether it has been subject to peer review or publication, (3) the known or potential rate of error, (4) the existence and maintenance of internal controls and standards, and (5) general acceptance in the expert community. *Id.* at 593–94, 113 S.Ct. 2786. These are now substantially codified in Rule 702.

Akiro contends that the Wallace Report does not meet a single one of these factors and contains no other indicator of reliability, because it employs no discernible technique or methodology at all; rather, Wallace merely compares the elements of the two brands in the same manner as would an ordinary lay juror. The Court is compelled to agree. Indeed, HOC does not

argue that the Wallace Report meets any of the *Daubert* factors or possesses any other indicator of reliability, and instead simply asserts that Wallace "possesses specialized knowledge from his personal experience and training that will assist the trier of fact to understand the evidence [and] to determine a fact in issue." Reply Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 3 (internal quotation marks omitted). But "[c]omparing products and store appearances is something the average trier of fact can perform without the assistance of" a marketing consultant. *Trouble v. Wet Seal, Inc.,* 179 F.Supp.2d 291, 303 (S.D.N.Y.2001) (excluding a similar expert report). As it simply dresses up HOC's view of the underlying factual evidence in expert garb, the Wallace Report must be excluded. The Court will therefore consider it on this motion only as attorney argument, and not as evidence.

HOC's second expert report is by Dr. Bruce Isaacson, president of a marketing research and consulting firm and a purported expert in "research, surveys, and marketing." Expert Report Submitted by Dr. Bruce Isaacson ("Isaacson Report"), ex. G to Colwin Decl., ¶ 9. Isaacson performed a consumer confusion survey using the so-called "Eveready" format, a standard survey format in which respondents are shown the defendant's products and asked questions to elicit whether they associate them with plaintiff's mark. *Id.* ¶ 3. Isaacson found that "only 1.8% of respondents were confused between Aunt Jackie's Curl La La [product] and Miss Jessie's," and "only 0.9% of respondents were confused between Aunt Jackie's Knot On My Watch [product] and Miss Jessie's." *Id.* ¶ 7. Isaacson found these percentages to fall "below levels that are typically considered significant." *Id.* ¶ 71.

*Lanham Act Claims*

■ Counts 1 and 2 of Akiro's complaint assert claims for trademark infringement

and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114, 1125. "To prevail on a claim of trademark infringement, a plaintiff must show that the defendant (1) without permission, copied, reproduced, or imitated the plaintiff's (2) registered trademark in commerce (3) as part of the sale or distribution of goods or services (4) and that such use is likely to cause confusion between the two marks." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 742 (2d Cir.1998). Here, HOC concedes that MISS JESSIE'S is a valid registered mark and that HOC has used the AUNT JACKIE'S mark in connection with the sale of goods without Akiro's consent. As in the typical trademark infringement case, Akiro's claim thus turns on whether HOC's use of the AUNT JACKIE'S mark is likely to cause consumer confusion with the MISS JESSIE'S mark. Such consumer confusion is also the crux of Akiro's false designation of origin claim. *See Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985).

■ In determining whether there is a likelihood of consumer confusion, courts consider the eight factors announced in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 493 (2d Cir.1961). Those factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir.2009). The Court accordingly takes up each of these factors in turn.

■ The first factor, the strength of the mark, measures a mark's "tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996). When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce. *Streetwise Maps*, 159 F.3d at 743–44.

■ As to inherent distinctiveness, "courts classify a mark in one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary." *Id.* at 744. Importantly, "[r]egistration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). Here, HOC does not dispute Akiro's assertion that MISS JESSIE'S was registered without proof of secondary meaning, nor does it present any evidence or argument to rebut the resulting presumption that the mark is inherently distinctive.

As to acquired distinctiveness, Akiro contends, based on advertising expenditures, press coverage, industry awards, and the length and exclusivity of the mark's use, that MISS JESSIE'S is a recognized leader in the natural hair product market. For its part, HOC concedes that the MISS JESSIE'S mark has acquired so-called "secondary meaning"—that is,

that consumers associate all goods sold under the mark with a single source. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir.2012).

In addition to the mark's undisputed inherent and acquired distinctiveness, HOC's own survey expert, Prof. Isaacson, describes the MISS JESSIE'S as "well-known" and "strong." Isaacson Report at 5–6. Indeed, Isaacson's expert report, on which HOC heavily relies, is based on a survey whose methodology, the Eveready format, is only valid and reliable when applied to widely recognized, commercially strong marks. The Court thus easily concludes for purposes of this motion that MISS JESSIE'S is a strong mark.

■ The second *Polaroid* factor concerns the similarity of MISS JESSIE'S and AUNT JACKIE'S. Similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances. *See Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir.2005); *see also Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1340 (2d Cir.1975) ("The examination of the similarity of the trademarks, however, does not end with a visual comparison of the marks. Trademarks, like small children, are not only seen but heard."). Moreover, "[s]ide by side comparison is not the appropriate test." *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 552 (S.D.N.Y.1996). Rather, "the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone." *Id.*

Here, Akiro contends that the two marks and their attendant trade dress are extremely similar. Both marks consist of two words, a one-syllable honorific followed by the possessive form of a two-syllable female first name. Akiro further argues that "Jessie's" and "Jackie's" look and sound similar—visually, both begin with "J" and end in "ie's," and aurally, both begin with a soft "j" sound and end with a hard "eez" sound. Akiro acknowledges that "Miss" and "Aunt" look and sound different, but contends that these initial honorifics are not the dominant element of the marks, and are easily interchangeable. Akiro further argues that the label design and overall commercial impression of the two brands are very similar, and that this is no accident—as HOC's marketing director told its trademark counsel, "a few of the brands in the natural hair category have trade dress that conveys a premium, old fashioned look and feel. That is the direction we have chosen too." Colwin Decl., ex. C, at DEF56–58. Akiro finally argues that one of HOC's AUNT JACKIE'S products is the same distinctive lavender color as MISS JESSIE'S Curly Pudding, its most well-recognized and best-selling product.

HOC argues to the contrary that the two marks and their trade dress are in fact markedly different. HOC notes that while Akiro separately dissects each element of the two marks, the Second Circuit has held that "[i]n order to determine if confusion is likely, each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 117 (2d Cir.1984); *see also San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.*, 565 F.2d 683, 685 (C.C.P.A.1977) ("Each syllable of each mark generates an 'impact,' but the only impact to be considered is that of the whole."). HOC also faults Akiro for conflating similarity with good or bad faith, and notes that there is a

"difference between an attempt to trade off the good will of another and the legitimate imitation of an admittedly effective marketing technique." *Haagen–Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F.Supp. 73, 75 (S.D.N.Y.1980). HOC further points out that, after consulting with counsel, HOC took affirmative steps to distinguish its new brand from MISS JESSIE'S, including by changing the proposed name from "Miss Jackie's" to "Aunt Jackie's" and by changing the font of its logo. HOC also points to the Wallace Report, which details the different product names, fonts, color schemes, logo elements, and package structures employed by the two brands.

Finally, as to the color of MISS JESSIE'S Curly Pudding, HOC notes that the colors correspond to different numbers on the Pantone Matching System, and thus, while similar, are discernibly different. HOC also notes that this color pertains to only one of a dozen different MISS JESSIE'S products, and points to the uncontradicted declaration of HOC's marketing director stating that the colors used in all of the AUNT JACKIE'S product formulas, including the lavender color Akiro complains of, came from colors that HOC had used in existing formulas for other products. Def.'s 56.1 ¶ 10.

The Court finds merit in both parties' arguments on this factor. While much of Akiro's argument proceeds by analyzing the constituent parts of the two marks, this is not a case of a Lanham Act plaintiff seizing upon a single element shared between otherwise dissimilar marks. *Cf. Universal City Studios*, 746 F.2d at 117. Rather, Akiro's analysis serves to illuminate an overall resemblance between MISS JESSIE'S and AUNT JACKIE'S and their attendant trade dress. Viewing the evidence in Akiro's favor, as the Court must on HOC's motion for summary judgment, the Court finds that a reasonable juror could view the marks and their trade dress as at least moderately similar. At the same time, HOC points to a number of obvious differences between the two marks and their trade dress. When viewing the evidence in HOC's favor, as required on Akiro's motion for summary judgment, the Court finds that a reasonable juror also could find the marks to be quite dissimilar. The Court thus concludes that this factor cuts against both parties' summary judgment motions, because whether the factor favors plaintiff or defendant is a function of whether one takes the evidence in the light most favorable to the defendant on plaintiff's motion or to the plaintiff on defendant's motion.

▮▮▮ The third and fourth *Polaroid* factors address the proximity of the products and the possibility of the senior user "bringing the gap" and entering the junior user's market. Put another way, these two factors "focus on the degree to which the products currently compete with each other or are likely to compete with each other in the future." *Mobileye, Inc. v. Picitup Corp.*, No. 12 Civ. 1994(JSR), 928 F.Supp.2d 759, 780, 2013 WL 830837 at *17 (S.D.N.Y. Mar. 5, 2013). "In examining this factor, the courts compare all aspects of the products, including price, style, intended use, target clientele, typical distribution channels, and others." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 316 (S.D.N.Y.2000) *aff'd sub nom. Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d 1262, 2000 WL 1721126 (2d Cir.2000). Akiro argues that the goods sold under the two marks in this case currently compete because they are both natural and curly hair products and are both available at beauty supply stores. *See* Def.'s 56.1 ¶¶ 38–39. Akiro also points out that an email from HOC's marketing director, as well as HOC's Rule 56.1(a) Statement in this very case, describe

MISS JESSIE'S as a "competitor" of AUNT JACKIE'S. Colwin Decl., ex. C, at DEF000056; Def.'s 56.1 ¶ 27. Akiro acknowledges that the products occupy different price points, but contends that this is, at most, a very small gap to bridge.

For its part, HOC concedes that MISS JESSIE'S and AUNT JACKIE'S products compete "to some degree," Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("HOC Moving Br.") at 14, but argues that the two brands' main channels of distribution differ, since AUNT JACKIE'S products are primarily distributed through beauty supply stores, while MISS JESSIE'S products are mainly distributed through beauty salons and Target stores. HOC also notes that the two brands are consciously priced differently, with MISS JESSIE'S in the "premium" portion of market and AUNT JACKIE'S situated between "premium" and "value." *See Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 318 (S.D.N.Y.2000) ("[T]he courts have defined the junior user's market narrowly, using such parameters as price range, target clientele, and distribution channels."). HOC further claims that there is no evidence that MISS JESSIE'S intends to move downmarket towards the price point AUNT JACKIE'S now occupies.

The Court concludes that Akiro has shown that these two *Polaroid* factors tip in its favor as a matter of law. Both brands sell goods in the natural and curly hair care product market, HOC itself has repeatedly described MISS JESSIE'S as a competitor, and while the brands' distribution channels are not coextensive, HOC does not dispute that they overlap. As for the price differences between the two brands' products, HOC points to no evidence in the record showing how large these price differences actually are. HOC represents in its moving brief that AUNT JACKIE'S products sell for a suggested retail price of $9.99 and that MISS JESSIE'S products sell for between $16.99 and $65.99, HOC Moving Br. at 1, but provides no citations for these facts, and its Rule 56.1 Statement does not mention these prices. In any event, even if these unsupported statements are accurate, such price differences would represent a small gap for Akiro to bridge given the other similarities between the products. *Cf. Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1174 (2d Cir.1976) (holding that scarf designer could properly prevent use of her tradename on cosmetics); *see also Paco Sport*, 86 F.Supp.2d at 318 (noting that the bridging-the-gap factor "weighs in the senior user's favor either if bridging the gap is actually probable or if an average consumer perceives it as probable"). Whether the Court views the record evidence in Akiro's favor or HOC's, these two factors favor Akiro.

 The fifth *Polaroid* factor, actual consumer confusion, "is not necessary to establish a likelihood of confusion but can often provide highly probative evidence of this likelihood." *Henegan Const. Co., Inc. v. Heneghan Contracting Corp.*, No. 00 Civ. 9077(JGK), 2002 WL 1300252, at *7 (S.D.N.Y. June 12, 2002). Here, both parties claim to have uncovered such highly probative evidence in their favor.

Akiro begins by arguing that a lack of consumer confusion would not be surprising or fatal to its infringement claims in this case, given that AUNT JACKIE'S products have been on the market for less than a year. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986) (holding that where "[t]here has been little chance for actual confusion," it "would be unfair to penalize appellee for acting to protect its trademark rights before serious damage has occurred"). Nevertheless, Akiro claims to

have identified the following instances of actual consumer confusion between MISS JESSIE'S and AUNT JACKIE'S, collected from Internet postings and documents produced by HOC in discovery:

> When I first saw this product I was actually convinced that it was a Miss Jessie's product. (Anyone familiar with this line will know why when you see it.) It wasn't until I got home that I realized it was something completely different. I am confident that there are some copyright issues going on there.

Branch Aff., ex. L, at 1.

> I saw aunt Jackie's products in my local beauty supply store (in durham, nc). They had it right beside the miss Jessie's and if you weren't paying attention, you'd mistake the two. The labels look JUST alike lol! My sister said since she can't afford Jessie's, Jackie's will do! Lol.

*Id.* at DEF100.

> No worries, I thought the same things. Plus I hate the name, I am tired of companies trying to relate to 'us' with names like Aunt Jackie, Miss Jessie's, As I Am, Kinky Kuly, etc. What happened to brands like KeraCare, Mizani, Design Essentials, LustraSilk, etc.

*Id.*

> FYI: There is a debate going on [Facebook] that some beauty bloggers don't want to try your products cause it resembles miss Jessie's.

*Id.*

> I love aunt Jackie's it was one of the first products I purchased when going natural and especially after I looked at the price of miss Jessie's and I decided to go with this product I love it and the smell is heavenly!

*Id.*

> "No shade to the products but why can't these new companies come out with more original packaging. This is the 2nd or 3rd new hair care line I have seen and the packaging resembles another line."

> Because it is all about marketing and buyer impulse. They are giving the illusion of another established product in the marketplace and thus capitalizing on the established reputation of that product. Maybe if the buyer doesn't notice, he/she will buy?? In my legal opinion it looks like trademark infringement and they are opening themselves up to a lawsuit.

*Id.* at DEF100–01 (quoting a comment from another user on the same comment thread).

> I stumbled across this product by Aunt Jackie['s] called "Curl La La" which claims to define curls. For only $7.99 I decided to try it. I assume Aunt Jackie['s] is a cheaper brand to Miss Jessie['s].

*Id.* at DEF101.

> Just purchased Aunt Jackie's almost like Miss Jessie's please let me know if you have tried it??

*Id.*

HOC argues in response that in all but one of these quotes, the speaker is merely comparing two different products recognized to be from different companies, or is speculating that other inattentive consumers might be confused. But, according to HOC, by comparing different brands or speculating about confusion by others, these speakers have actually demonstrated that they themselves were not confused. HOC concedes that the first quote above, in which a blogger states that she mistakenly believed that an AUNT JACKIE'S product was in fact a MISS JESSIE'S product until she returned home from the store, does show true actual confusion, but contends that one or two instances of actu-

al confusion constitutes mere *de minimis* evidence insufficient to raise a genuine issue of fact. *See Mr. Water Heater Enterprises, Inc. v. 1–800–Hot Water Heater, LLC,* 648 F.Supp.2d 576, 588 (S.D.N.Y. 2009); *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir. 1985).

In addition, HOC points to affirmative evidence of a lack of consumer confusion in the form of the Isaacson Report, which concluded that actual confusion between the two brands is negligible. That report is based on an Eveready format survey of 440 women who said they used hair curling or detangling products at least weekly and intended to purchase such products in the next 90 days. Isaacson Report, ¶¶ 26, 46. The survey was conducted at shopping malls spanning the United States, where respondents were stopped and interviewed by trained interviewers, who then typed the answers directly into an online form. *Id.* ¶¶ 29, 44. The survey was validated by an independent firm, and Isaacson personally reviewed all responses after they had been coded by his staff. *Id.* ¶ 44–45, 48. HOC thus contends that Isaacson's finding is admissible and reliable.

In response, Akiro argues that the Isaacson survey is flawed and untrustworthy, and therefore entitled to little or no evidentiary weight, for five reasons. First, Akiro contends that Isaacson's failed to confirm that survey respondents were familiar with the MISS JESSIE'S mark. *See Clinique Laboratories,* 945 F.Supp. at 552 ("[T]he correct test [for likelihood of confusion] is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone."). Second, the survey respondents here were approached at shopping malls and were questioned in separate interviewing facilities, rather than at beauty supply stores, where both competing brands' products are sold. *See THOIP v. Walt Disney Co.,* 690 F.Supp.2d 218, 231 (S.D.N.Y.2010) ("The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility."). Third, survey respondents were only shown two out of Aunt Jackie's four products. *See* Isaacson Report, f 25. Fourth, Akiro contends that HOC has failed to show that the Eveready format was appropriate for this case. Akiro notes that a leading treatise has explained that this format is appropriate "in cases where plaintiff makes some products which defendant does not." 6 McCarthy on Trademarks & Unfair Competition § 32:174 (4th ed.). Here, however, Akiro contends that the plaintiff make the same, not different products.

Fifth and finally, Akiro claims that the Eveready format consistently underestimates instances of confusion among marks that, like MISS JESSIE'S, are not iconically strong. As one commentator has explained, this format "has become the gold standard in cases involving strong marks, i.e., in cases where the senior mark is highly accessible ... in memory, enhancing the likelihood that it will be cognitively cued by a junior user's mark." Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt,* 98 Trademark Rep. 739, 739 (2008) (footnotes omitted). However, "[c]omparatively few [marks] have (or can hope to develop) sufficiently strong memory traces so as to be cued by pattern matching engendered by a monadic exposure to a similar junior use." *Id.* at 748. For that reason, "[t]he *internal search* of memory for a strong brand's schema that exists at the core of an Eveready study is thus hostile to the general run of marks. For weak marks, an Eveready format will consistently produce negligible estimates of likelihood of confusion." *Id.*

The parties have thus presented conflicting evidence of actual consumer confusion, and ask the Court to draw conflicting inferences and give different degrees of weight to different pieces of that evidence. Once again, whether one view the evidence favorable to plaintiff or to defendant makes all the difference.

Viewing the evidence in HOC's favor, the Court finds that a reasonable juror could easily determine that there is no actual confusion and that this *Polaroid* factor strongly favors HOC. The Isaacson Report follows a standard, generally accepted survey format and presents a definitive finding that a negligible number of consumers were confused. Akiro's objections to the Isaacson Report at most diminish the weight of the survey evidence, and a reasonable juror would be well within his or her rights to dismiss those concerns, as well as Akiro's anecdotal evidence of actual confusion, as unpersuasive.

Viewing the evidence in Akiro's favor, however, a reasonable juror could discount HOC's survey evidence to some degree and find that this *Polaroid* factor favors HOC only weakly. While the Eveready format is generally accepted and represents the "gold standard" for cases involving strong marks, by design it will underestimate confusion for marks that are not highly accessible in a consumer's memory. Although MISS JESSIE'S is inherently distinctive and has acquired secondary meaning, a reasonable juror could conclude that the mark is weak enough to diminish somewhat the evidentiary weight of the Isaacson survey. Moreover, while several of the quotations collected by Akiro show mere comparisons rather than confusion, others plausibly indicate true actual confusion. *See* Branch Aff., ex. L, at 1 ("When I first saw this product I was actually convinced that it was a Miss Jessie's product."); *id.* at DEF100 ("They had it right beside the miss jessie's and if you weren't paying attention, you'd mistake the two. The labels look JUST alike lol!"); *id.* at DEF101 ("In my legal opinion it looks like trademark infringement . . . ."); *id.* ("I assume Aunt Jackie['s] is a cheaper brand to Miss Jessie['s]."). On balance, the Court thus concludes that while this *Polaroid* factor may favor HOC as a matter of law, the degree to which it does so depends materially on how the trier of fact views the evidence.

■■■■ The sixth *Polaroid* factor is bad faith, which concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991). On this factor, the parties rely on the same evidence, but ask the Court to draw radically different inferences.

Akiro views the facts as follows. After years of research in which HOC familiarized itself with all of the existing brands in the natural and curly hair product market, HOC considered a number of different names for its new product line, and eventually narrowed its choices to Miss Leslie's and Miss Jackie's. Even though HOC's trademark counsel advised that Miss Leslie's was the "clearer" mark, Branch Aff., ex. K, at DEF16, HOC chose Miss Jackie's. HOC's marketing director then sent an email to its trademark counsel explaining that it wanted its brand to evoke the same "a premium, old fashioned feel" as MISS JESSIE'S. Colwin Decl., ex. C, at DEF56–58. Counsel then advised HOC that the trademark searches he had previously run did not account for the fact that HOC had a specific competitor in mind, advised HOC to "stay away from anything Miss Je[ss]ie's is doing," and warned that "there is a risk that Miss Je[ss]ie's will

complain about the trade dress overall and the MISS JACKIE'S mark specifically." *Id.* at DEF59. HOC then replaced "Miss" with "Aunt" and changed the font of its logo, but otherwise pressed ahead.

For its part, HOC stresses that it consulted with trademark counsel at each stage of the development of the AUNT JACKIE'S brand. *See Lang v. Ret. Living Pub. Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991) ("[A] request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith."). While HOC's counsel did advise HOC to "stay away from anything Miss Je[ss]ie's is doing," counsel's specific admonition was to change the proposed product name of "La Crème," given that Miss Jessie's already had a product named "Crème de la Crème." Colwin Decl., ex. C, at DEF59 ("While Miss Jessie's was unsuccessful in getting a registration for CRME DE LA CRME, and there are other CRME marks out there, you really need to stay away from anything that Miss Je[ss]ie's is using."). HOC then followed that advice, and changed that product name to In Control.

Moreover, while counsel did warn of potential litigation over the proposed Miss Jackie's (later AUNT JACKIE'S) trade name, counsel also advised that HOC would have good defenses to any infringement claim. And when counsel suggested that HOC alter the font of its logo and change "Miss" to a different honorific in order to more clearly differentiate its mark from MISS JESSIE'S, HOC did so. HOC thus contends that Akiro has shown only that HOC was aware of Akiro's mark and imitated certain successful features of its brand, both of which are permissible under the Lanham Act. *See Playtex Products, Inc. v. Georgia–Pac. Corp.,* 390 F.3d 158, 166 (2d Cir.2004) ("Prior knowledge of a senior user's mark does not, without

more, create an inference of bad faith.... Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a free ride is permitted.").

In the end, these arguments illustrate why "issues of good faith are generally ill-suited for disposition on summary judgment." *Lang v. Ret. Living Pub. Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991) (alterations omitted). HOC claims that it conscientiously consulted with trademark counsel and that it followed and relied upon the advice it received. Based on the same evidence, Akiro contends that HOC was determined to capitalize on the reputation of MISS JESSIE'S, belatedly informed counsel that it was using MISS JESSIE'S as a template, and then pressed ahead after changing its mark and trade dress in minimal ways that placated counsel but still enabled HOC to trade on its competitor's goodwill. Which of these stories to credit is for the jury to resolve at trial. For purposes of the instant motions for summary judgment, the Court concludes that both sides have raised triable issues of fact on this *Polaroid* factor.

■ The seventh *Polaroid* factor, the quality of the parties' products, directs courts to weigh cross-cutting considerations. On the one hand, the court must determine "whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.,* 182 F.3d 133, 142 (2d Cir.1999). On the other hand, if the products are roughly equal in quality, the court must also consider whether "that very similarity of quality" may tend to create confusion as to source by bringing the products into even closer proximity. *Id.* In this case, Akiro attempts to take both forks of this road, contending that its products are su-

perior because they have garnered numerous industry awards and accolades, while also maintaining that, even if HOC's products were of equal quality, this factor would still tip in Akiro's favor. HOC responds that, given that AUNT JACKIE'S products have been on the market for less than a year, a lack of awards is not indicative of a lack of quality, and notes that it has gotten positive reviews from customers.

The Court concludes that this factor is neutral. The current record contains scant evidence as to whether AUNT JACKIE'S products are inferior to MISS JESSIE'S products, and even if there were sufficient facts for a reasonable juror to reach a conclusion on that question, the record also contains little evidence about the nature of the relevant market that might illuminate whether any similarity or difference in quality would make consumer confusion more or less likely.

■■■■■ The final *Polaroid* factor concerns the sophistication of the purchasers in the relevant market. This factor "usually militates against a finding of a likelihood of confusion, though it might on occasion *increase* the likelihood of confusion, depending upon the circumstances of the market and the products." *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.,* 830 F.2d 1217, 1228 (2d Cir.1987) (internal citation omitted). Here, Akiro does not dispute that consumers in the natural and curly hair product market are sophisticated in that they tend to read product labels and research available products and styles. Akiro notes, however, that the products at issue here are relatively inexpensive, and thus more likely to be purchased on impulse rather than after careful research. Akiro further asserts that to the extent sophistication is relevant in this case, it actually cuts in Akiro's favor. But Akiro fails to explain what aspects of the market

and products at issue would support a reasonable counterintuitive inference that sophisticated consumers are more likely to be confused in this instance. *Cf. Lois Sportswear, U.S.A.,* 799 F.2d at 875 ("[W]e believe that it is a sophisticated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattern on appellants' jeans indicates some sort of association between the two manufacturers. Presumably it is these sophisticated jeans buyers who pay the most attention to back pocket stitching patterns and their 'meanings.' "). The Court accordingly concludes that this factor favors HOC.

Upon review of all of the *Polaroid* factors, the Court is compelled to deny both parties' motions for summary judgment. When viewing the evidence in Akiro's favor, as the Court must on HOC's motion for summary judgment, five factors to varying degrees indicate a likelihood of consumer confusion—namely, strength of the mark, similarity of the marks, proximity, bridging the gap, and bad faith. Of the remaining three factors, two—actual confusion and consumer sophistication—favor noninfringement, and quality of the products is neutral. Thus, on HOC's motion, a clear majority of factors favor Akiro, including strength, similarity, and proximity, which the Second Circuit has described as the most important *Polaroid* factors in most cases. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir.1987). Moreover, viewing the evidence in Akiro's favor, actual confusion favors HOC only somewhat weakly, and consumer sophistication alone is not weighty enough to tip the balance.

As to Akiro's motion, however, on which the Court must view the evidence in the light most favorable to HOC, four factors tip strongly against a likelihood of consumer confusion—namely, similarity, actual

confusion, good faith, and consumer sophistication. Of the remaining factors, quality of the products is neutral, and strength, proximity, and bridging the gap tip the other way. But Akiro's strong mark and the fact that the two brands' products compete with one another are not, on their own, sufficient to overcome the other factors and entitle Akiro to judgment as a matter of law.

Accordingly, the parties' cross-motions on counts 1 and 2 of the complaint thus are both denied.

### New York Unfair Competition Claim

 Count 3 of the Complaint asserts a cause of action for unfair competition under New York law. "To prevail on a claim of unfair competition under New York law under either a misappropriation or a palming off theory, a plaintiff must show a likelihood of confusion or deception of the consuming public as to the source of the allegedly infringing product [or service] *and* bad faith on the part of Defendants." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of New Jersey*, 894 F.Supp.2d 288, 326 (S.D.N.Y. 2012). As explained above in reference to Akiro's Lanham Act claims, both parties have raised genuine issues of fact as to the likelihood of consumer confusion and as to HOC's good or bad faith. Accordingly, similar to the Lanham Act claims, the Court denies both parties' motions for summary judgment on this claim as well.

### New York Trademark Dilution Claim

 The final count of Akiro's complaint asserts a claim for trademark dilution under New York General Business Law section 360–*l*. To prevail on a claim under this provision, a plaintiff must show "(1) a distinctive mark capable of being diluted, and (2) a likelihood of dilution." *Mobileye*, 928 F.Supp.2d at 782, 2013 WL 830837, at *19. In showing a likelihood of

dilution, however, the plaintiff must show that the marks are not just similar, but "substantially" similar. *Id.* As this Court recently had occasion to reiterate, "[t]he substantial similarity test requires more than the familiar test of similarity used in the traditional infringement context. Marks must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." *Id.; see also Miss Universe, L.P., LLLP v. Villegas*, 672 F.Supp.2d 575, 595–96 (S.D.N.Y.2009) (holding that " 'Miss Asia USA' is not similar enough to 'Miss USA' " to survive summary judgment under this standard).

Here, HOC contends that MISS JESSIE'S is not sufficiently similar to AUNT JACKIE'S to pass muster under this standard, and the Court agrees. Viewing the evidence in the light most favorable to Akiro, while the two marks may be similar enough for one to infringe the other, they are not so similar that consumers would view the marks as essentially the same. Accordingly, on this count of the Complaint, the Court denies Akiro's motion, grants HOC's motion, and dismisses the claim.

In sum, it was for the foregoing reasons that the Court, by Order dated April 12, 2013, denied Akiro's motion for summary judgment in full; denied HOC's motion for summary judgment as to the claims for federal trademark infringement, false designation of origin, and unfair competition under New York law; and granted HOC's motion for summary judgment as to the claim for trademark dilution under New York law. As previously ordered, trial on the remaining claims will commence on May 20, 2013 at 9:00 a.m.

SO ORDERED.